Leonard W. Lea v. Commissioner.
Lea v. Commissioner
Docket No. 51929.
United States Tax Court
T.C. Memo 1957-31; 1957 Tax Ct. Memo LEXIS 221; 16 T.C.M. (CCH) 144; T.C.M. (RIA) 57031; February 15, 1957
*221 Held, that respondent has not established that the returns for the years involved were false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the 1939 Code; and that, therefore, assessment and collection of the determined, assessed and claimed liabilities were and are barred by the limitation provisions of section 275(a). John Y. Merrell, Esq., Shoreham, Building, Washington, D.C., for the petitioner. Elmer E. Lyon, Esq., for the respondent. PIERCE Memorandum Findings *222 of Fact and Opinion PIERCE, Judge. The respondent made determinations and jeopardy assessments of deficiencies and of additions to tax for fraud in respect of the income taxes of petitioner, as follows: Addition to tax
Year
Deficiency
(Sec. 293(b))
1940
$ 394.10
$ 197.05
1941
1,524.95
762.48
1942
6,824.98
3,412.49
1943
12,662.47
7,678.43
1944
14,473.14
7,236.57
1945
19,108.85
9,554.43 Also, by amendment to his answer herein, the respondent has claimed increases in certain of the above amounts, as follows: Increase
Increase in
in addition
Year
deficiency
to tax
1941
$ 98.39
$ 49.19
1943
43.03
21.52
1944
437.31
218.66
The initial question for decision is whether assessment and collection of the above-mentioned deficiencies and additions to tax were and are barred by the applicable statute of limitations. The answer to this depends on whether or not the returns filed for such years were false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the Internal Revenue Code (1939). Several other questions have been raised as to the correctness of the adjustments and determinations *223 made by the respondent; but, unless it is found that the period for assessment was and is open, consideration of such questions will not be reached. Findings of Fact The petitioner Leonard W. Lea was, during the years involved, the owner and operator of two moving picture theaters in and near Danville, Virginia. He filed an individual income tax return for each of said years, with the then collector of internal revenue for the district of Virginia. At the time of the trial, petitioner was 58 years of age. He had attended school through about the sixth grade, and also had received some additional part-time schooling. His first contact with the theater business was at about the age of 24 years, when he became assistant secretary of the Y.M.C.A. at Schoolfield (a small town located about 3 miles from Danville) and, as part of his duties, operated a moving picture theater for the Y.M.C.A. on two nights per week. He held this position for about 9 years, until August 1930; and he then worked for about 4 months as an attendance checker for motion picture distributors, and for about 3 months as manager of the Capitol Theater in Danville. In March 1931 petitioner acquired a lease on *224 the Y.M.C.A. theater in Schoolfield (hereinafter called the "Schoolfield Theater"), which he had previously managed; and thereafter he operated this theater, as a proprietor, until January 1, 1945. Also, in the later part of 1939, he acquired a lease on the Lea Theater in Danville; and he likewise operated this, as a proprietor, until January 1951. The Schoolfield Theater had 520 seats; and the Lea Theater had 486 seats. They were located about 2 or 3 miles apart; and petitioner had from 18 to 22 employees who worked interchangeably between them. Petitioner was only the independent operator in the Danville area; and, by reason of this fact, he was unable to obtain first and second run pictures, and his admission prices were very low; they ranged from 5 to 15 cents for children, and from 10 to 28 cents for adults, including tax. The gross receipts of each theater consisted of proceeds from the sale of tickets at the box office, and from the sale of popcorn, candy and soft drinks at the refreshment stand. The system used to record these receipts, and also to record the expenses of operation, was one which petitioner had used previously on behalf of the Y.M.C.A. It was substantially *225 as follows: The cashier in the box office of each theater kept, on a printed form, an hourly record of each day's operations (hereinafter called the "daily box office report"); and on this she entered, among other things, the number of tickets sold, the ticket prices, and the total receipts from tickets, for each hour of the day that the theater was open for business. All tickets were numbered consecutively, and were sold from rolls contained in a magazine in the box office. No ticket was sold other than from such roll, except when a ticket was returned for refund because of inability of a patron to find a seat. The cashier was held accountable for the number of tickets sold, and also for the cash received therefor - all as recorded on the daily box office report. Whenever the cashier was relieved during the course of the day, an accounting for the tickets sold and for the cash on hand was made with the substitute. Many of the films for the theaters were rented on a percent-of-receipts basis, and attendance checks made by lessors of the films provided an additional check on the accuracy of the box office reports. The practice was for the cashier to make certain "pay-outs" from *226 the box office receipts, for such items as various supplies for the refreshment stand, laundry, and minor personal erpenditures of the petitioner. In the case of each pay-out, the cashier would make an appropriate notation thereof on the back of the daily box office report, showing the amount of the pay-out and the purpose for which it was made. At the end of the day, the cashier would enter totals on the daily box office report, which showed the total number of tickets sold during the day, the total receipts therefrom, and the total of the pay-outs made by her. She then would place in a box, both the report and the money on hand, and would deliver these to the person in charge of the theater. Such person would thereupon remove the money from the cash register at the refreshment stand, check the amount against the reading of the register, and make a notation of such amount on the back of the daily box office report. The aggregate of the day's receipts from the box offices of the two theaters and from the refreshment stands thereof, less the payouts, (all as shown on said reports) constituted substantially all of the receipts from the theater operations for the day. The only other *227 receipts consisted of very small amounts obtained from such sources as vending machines and advertising of merchants. At the principal office for the two theaters, which was located in the Schoolfield Theater building until the theater was closed on January 1, 1945, there was maintained an account book (hereinafter called the "cash receipts and disbursements journal") which purported to show the total receipts and total expenses of both theaters. This book contained long columnar sheets on which were entered, according to days and months: (1) The amounts of the net receipts deposited in the bank account for the theaters; (2) a description of each check for expenses drawn against such bank account, which showed the check number, the amount thereof, and the name of the payee; and (3) a distribution of such expenses to columns bearing such headings as "feature film rental," "supplies," "house salaries," and "general expenses." Numerous and varied expenditures made on behalf of petitioner personally were entered in the "house salaries" column and were usually marked with petitioner's initials so as to distinguish them from expenses of the business. At the end of the entries for each *228 calendar year, there was a summary sheet which contained a recapitulation by months, of all the entries made for the year. This cash receipts and disbursements journal and the above-mentioned daily box office reports were, except for certain weekly estimate sheets, the only permanent accounting records of the operations of the two theaters. All entries in the journal were made either by an employee, Inez Hatcher (hereinafter called Inez), or by clerical employees who assisted her. Petitioner did not make any of these entries, nor did he prepare any of the daily box office reports. Inez made practically all deposits of theater receipts in the bank account; and she also wrote and signed most of the checks drawn in payment of expenses. She had been employed by petitioner for many years, had done all types of work in the two theaters, and during the years here involved was regarded as the bookkeeper; but she had no education in bookkeeping except a commercial course in high school. Her clerical assistants were inexperienced. During the war period of 1942 to 1945, petitioner had found it practically impossible to obtain competent clerical help. There was considerable confusion on the *229 part of the clerical help in the handling of certain theater expenses which were paid in cash. These included not only items covered by the above-mentioned box office pay-outs; but also other items including the wages of employees, which were paid sometimes out of undeposited theater receipts, and sometimes out of personal funds of petitioner. In order that these cash expenditures might be recorded on the cash receipts and disbursements journal, checks to cover the same were from time to time drawn to the order of "L. W. Lea, Manager"; and the amounts of such checks were then allocated among the appropriate expense columns of the journal. In cases where such checks represented pay-outs from the box offices or payments made from other undeposited theater receipts, they were endorsed and deposited in the theater bank account; and the bookkeepers were supposed to enter the amounts thereof also in the "Deposits" column of the journal, so that the aggregate amount of the deposits would reflect the total gross receipts of the theater operations, rather than merely that portion of the receipts which remained after the cash payments had been made therefrom. On the other hand, where such checks *230 represented expenditures made out of petitioner's personal funds, the checks were not deposited in the theater account, but would either be cashed or be deposited in petitioner's personal bank account. And in still other cases, where the checks represented expenditures made partly out of undeposited theater receipts and partly out of petitioner's personal funds, only the portion thereof which represented theater receipts would be deposited in the theater bank account; and a notation would then be made on the deposit slip, showing "cash-off" withheld for the petitioner. This unusual method of handling cash expenditures was confusing to the bookkeeping employees. Frequently, where such checks represented replacement of expended theater receipts, the bookkeepers entered the amounts thereof only in the expense columns of the journal, without also adding them to the receipts shown in the "Deposits" column. Thus, the amount of the total theater receipts was understated on the cash receipts and disbursements journal. Also, in some instances, the bookkeepers failed to indicate on the journal that expenditures made for petitioner personally were chargeable to his personal account, with the *231 result that the theater expenditures shown on the journal were somewhat overstated. The theater bank account, during all of the years involved, was in the American National Bank & Trust Co. in Danville. Also, in this same bank, petitioner had another account in the name of the Old Reliable Products Company (hereinafter called the "Old Reliable account"). This account had in past years been taken over from a dissolved partnership of which petitioner had been a member; and, until 1942, it had been relatively inactive. In this latter year, however, it became active by reason of the following circumstances. In 1939 the textile mills in Danville and Schoolfield commenced paying their employees by check. Petitioner's practice was to accommodate the mill employees by cashing their payroll checks; and, to do this, he would prior to each payday borrow from three to five thousand dollars from the bank on very short-term notes that had maturities of 2 to 5 days. The cashed payroll checks would thereafter be deposited in the theater account; and, in order to offset them, petitioner instructed the bank to charge the notes to the same account, at maturity. The bank, however, sometimes failed *232 to comply with these instructions, with the result that the bookkeeper for the theaters had difficulty in reconciling the bank statements with the accounting records. In November 1942, the bank suggested to petitioner that he use the Old Reliable account for cashing mill checks; and this was done, with the result that thereafter there were many deposits and withdrawals in the Old Reliable account. Also, after said date, petitioner used the account more extensively as a depository for his personal funds; and he also deposited therein funds which were sent to him by one of his sons who was in the Navy, and other funds which he borrowed from his brother. No receipts of the theater business were ever deposited in the Old Reliable account. Apart from the theater, petitioner's only income during the taxable years involved was from rents of less than $1,000 per year, which he received from real property that he owned in Danville. Petitioner's income tax returns for the years involved were filed on or about the following dates: Year
Filing date
1940
March 15, 1941
1941
March 16, 1942
1942
April 13, 1943
1943
March 17, 1944
1944
March 19, 1945
1945
March 15, 1946
*233 All these returns were preparted for petitioner, either by Robert H. Dunn, a certified public accountant with 16 years' experience in the preparation of income tax returns, or by this accountant's assistant. In preparing the 1940 return, the accountant used the mash receipts and disbursements journal; but for the returns of the other years, he or his assistant used the above-mentioned summary sheets which contained recapitulations of the journal entries. Any additional information found to be necesary was, upon request of the accountants, assembled by Inez, the bookkeeper. As regards the deductions claimed for such items as depreciation and amortization of leasehold improvements, which were not reflected on the theater journal, the amounts of these were determined by the accountants. Also, the accountants determined whether expenditures for repairs should be capitalized or be expensed. The accounting records used in preparing the returns were delivered to the accountant in January of each year; but the accountant, due to the volume of his other work, seldom had the returns ready for petitioner's signature before March 15. At the time of signing the returns for the years 1943 and *234 1944, petitioner had some misgivings as to whether these correctly reflected his income. But he did not know them to be inaccurate; and the accountant advised that, because the due dates were at hand, they should be filed as prepared and that reexaminations should thereafter be made. Such reexamination of the 1943 accounts disclosed that the income of that year had been understated, due to the fact that certain checks issued to cover cash expenditures made from undeposited theater receipts had not been added to the receipts shown on the journal, which they were intended to restore; and, accordingly, an amended return for 1943 was filed. However no amended return was filed for the year 1944, because the accountant informed petitioner that substantial losses and amortization were allowable in respect of his leasehold properties, by reason of the termination of the Schoolfield Theater lease on December 31, 1944. Respondent's examination of petitioner's returns for the years involved was completed in March 1947; but the deficiency notice herein was not issued until December 23, 1953. Jeopardy assessments of the liabilities determined in said notice of deficiency were made on December 16, 1953. *235 In 1949 petitioner engaged Lee R. Manning, a certified public accountant and also an attorney at law, to make an examination of the accounting records of all years here involved. Manning thereupon recast the accounts for all these years. He redetermined the amount of the annual theater receipts from the original box office reports; redetermined the amounts of the annual expenses by comparing the expense entries on the journal with the original checks and vouchers; recomputed the amounts allowable for depreciation, amortization and losses on leasehold improvements; and reviewed the classification of capital and current expenditures. From such examination, Manning concluded that the net income reported on the return for each of the years involved was understated. The correct amounts of petitioner's gross receipts for the years here involved are those which Manning redetermined from the daily box office reports of the theaters. These amounts, and the amounts of the gross receipts reported on the returns, are as follows: Gross receipts
per daily box
Gross receipts
Year
office reports
per return
1940
$ 92,813.40
$ 93,984.25
1941
108,146.31
111,034.77
1942
141,401.77
136,155.72
1943
157,712.07
135,876.75
1944
145,412.17
130,636.23
1945
113,905.42
109,417.73
*236 None of the returns filed by petitioner for the years involved was false or fraudulent with intent to evade tax. Opinion The deficiency notice herein was issued, and jeopardy assessments of the determined liabilities were made, about 7 1/2 to 12 1/2 years after the several returns for the years involved were filed. Respondent contends that, notwithstanding such delay, the liabilities determined, assessed and claimed were and are not barred by the statute of limitations, for he alleges that all the returns were false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the 1939 Code. Such claim of fraud is based principally upon the understatement of theater receipts on the returns. He used the so-called bank deposit method for estimating the amounts of such receipts; and he now charges that the results of such estimating disclose a pattern of annual understatement, which raises presumption of fraud. As regards the deductions taken on the returns (which respondent determined to be excessive), he does not specifically charge that any excess in the deductions is due to fraud; and he has offered no proof which would tend to substantiate a finding of fraud *237 with respect to them. Petitioner concedes that the reexamination of theater accounts, which he caused to be made by his accountant Manning, revealed understatements of receipts for some of the years involved. But he denies that the amounts of such understatements are are large as those determined by the respondent, denies that any of them were intentional or due to fraud; and contends that they resulted solely from the inefficiency of his bookkeeping help, and from their failure to make proper entries in the journal of the correct theater receipts shown on the daily box office reports. The burden of proving that the petitioner is guilty of fraud with intent to evade tax is on the respondent. Section 1112 of the 1939 Code. It is our opinion, after viewing the witnesses and analyzing all the evidence, that respondent has failed to sustain such burden. This is not a case where there is no record of the taxpayer's actual receipts; nor is it one where there is positive evidence of manipulated records, concealment, or misrepresentation. To the contrary, we here have access to the original box office reports which are the basic records of the receipts of petitioner's theaters for each *238 hour of their operation. These reports were prepared currently by the cashiers in the box offices, in the regular course of their business duties and without participation by the petitioner. The reports appear to be fair and regular on their face; their is no evidence whatever that they have been altered or tampered with; and the fact that representatives of the film leasing companies made independent checks on the theater attendance, gives additional assurance of the accuracy of the box office reports. On the other hand, we are not satisfied that respondent's estimates of theater receipts, which he made by use of the so-called bank deposit method, are reliable. We recognize, of course, that an examination of a taxpayer's bank deposits, and also of his net worth, may properly be resorted to for the purpose of approximating income; but as the Supreme Court has indicated, great care and restraint must be exercised in drawing inferences of guilt from such circumstantial evidence. Holland v. United States, 348 U.S. 121. Moreover, we are convinced that the respondent, in applying the bank deposit method in the instant case, erred in at least two important respects. In the *239 first place, he included not only the deposits made in the theater bank account, but also those made in the Old Reliable account - although, as we have hereinbefore found as a fact, no receipts of the theater operations were deposited in the latter account. In the second place, he added to his adjusted total of the deposits in these two accounts, the sum of $1,200 per year for estimated personal expenses of petitioner, alleged to have been paid out of undeposited theater receipts. The impropriety of such adjustment is shown by the facts that personal expenses of petitioner, in amounts greatly in excess of $1,200 per year, were paid by checks drawn on the theater bank account; that entries of such checks were made in the journal, which disclosed the names of the payees and which, in most instances, revealed the purposes for which the expenditures were made; and also that entries of these checks were made in the "house salaries" column of the journal, which were usually identified with petitioner's initials so as to show that they did not constitute expenses of the business. We are satisfied, from our examination of the evidence, that the correct amounts of petitioner's gross receipts *240 for the years involved are those which accountant Manning determined from the daily box office reports; and, in our findings of fact, we have given approval to the use of such amounts. For the years 1940 and 1941, these amounts are less than the gross receipts reported on petitioner's returns; but for the other 4 years, they are greater than the reported receipts. Such understatements of receipts are not condoned; but, after observing the inadequacy of petitioner's bookkeeping system and the inefficiency of his bookkeeping help, we are not convinced that such understatements resulted from any fraudulent intention of the petitioner to evade tax. We hold that respondent has failed to establish that the returns here involved were false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the 1939 Code. Accordingly, we further hold that assessment and collection of the liabilities which respondent determined, and also of the increased liabilities which he now claims, were and are barred by the limitation provisions of section 275(a). By reason of such holdings, we do not reach a consideration of the other issues raised by the pleadings. Jeopardy assessments *241 having been made. Decision will be entered under Rule 50.